# Wytheville.

AMERICAN NET & TWINE CO. v. MAYO & OTHERS.

## JUNE 15, 1899.

1. FRAUDULENT CONVEYANCES—*Privity of Grantee—How Charged.*—The privity of a grantee in the fraud of his grantor is sufficiently charged by charging that the deed was made not only without any consideration deemed valuable in law, but with intent to hinder, delay, and defraud the creditors of the grantor. It is not necessary to charge expressly that the grantee had notice of the fraud intended by the grantor.

2. FRAUD—*How Charged—Intent to Hinder, Delay and Defraud.*—Generally fraud should be charged by setting forth the particular manner in which the act was done, and the end and design to be accomplished. If these show that fraud was designed and perpetrated it is not necessary to aver the legal conclusion that they constitute fraud. But the charge that a deed was made with intent to hinder, delay, and defraud creditors is not the mere statement of a legal conclusion, but a charge of a material fact.

3. CHANCERY PLEADING—*Certainty in Charges of Fact.*—General certainty is all that is required in the statement of facts in a bill. A charge in general terms where it is the point on which a case turns, and not merely incidentally involved, will warrant the production of evidence of the particular facts.

4. FRAUD—*Burden of Proof—Indicia of Fraud.*—The burden of proving fraud is primarily on him who charges it, but where *indicia* of fraud are clearly shown the burden is shifted to the other side to show the *bona fides* of the transaction.

5. FRAUDULENT CONVEYANCES — *Fraud of Grantor — Knowledge of Grantee—What Sufficient.*—In order to avoid a conveyance on the ground of the fraudulent intent of the grantor, it is not necessary to prove that the grantee had positive knowledge of such fraudulent intent. It is sufficient to prove that the grantee had knowledge

Opinion.

of facts and circumstances which would have excited the suspicion of a man of ordinary care and prudence, and put him upon inquiry as to the *bona fides* of the transaction, which inquiry would necessarily have led to a discovery of the fraud of his grantor.

Appeal from a decree of the Court of Law and Chancery of the city of Norfolk pronounced July 18, 1898, in a suit in chancery, wherein the appellant was the complainant and the appellees were the defendants.

*Reversed.*

The facts sufficiently appear in the opinion of the court and the dissenting opinion.

*Fentress & Agelasto* and *Loyall & Taylor*, for the appellant.

*D. Tucker Brooke*, for the appellees.

CARDWELL, J., delivered the opinion of the court.

This is an appeal from a decree of the Court of Law and Chancery of the city of Norfolk dismissing the bill of appellant, the American Net and Twine Company, a corporation, filed against B. Mayo and his wife, and John T. Mayo, their son, the purpose of which is to set aside two deeds executed by B. Mayo and wife to their son, John T. Mayo, whereby the latter acquired all of the real estate of which B. Mayo was seised and possessed at the time the deeds in question were executed. The bill alleges and charges that the deeds were not upon a consideration deemed valuable in law, but were executed with intent to hinder, delay, and defraud complainant, and that since the conveyances were made B. Mayo has no property out of which the judgment in favor of complainant against him can be made.

The two deeds in question were executed on the 20th day of October, 1896, during the pendency of the suit of appellant on the law side of the Court of Law and Chancery of the city of

Norfolk, in which the judgment in favor of appellant before
referred to was obtained.

The defendants, B. Mayo and wife, answered the bill jointly.
They admit the execution of the deeds to their son, but deny
that they were made without consideration deemed valuable in
law, or that they were made to hinder, delay, and defraud com-
plainant.

The answer of John T. Mayo states that it is true that on the
20th day of October, 1896, and after the institution of the com-
mon law suit of complainant against B. Mayo, B. Mayo con-
veyed, by two separate deeds to respondent, the real estate in the
bill set out and described, and that respondent is the son of
B. Mayo. Respondent then denies that the conveyances were
made by B. Mayo in anticipation that judgment would be re-
covered against him by the plaintiff in the common law suit, or
with the object or intent on his part to prevent the plaintiff from
realizing anything on the judgment, if obtained, from the prop-
erty so conveyed to respondent, and that if B. Mayo had any
fraudulent purpose in his mind in making the conveyances to
respondent he (respondent) was not informed of such purpose,
and did not unite in it. He further denies that the deeds in
question were not upon a consideration deemed valuable in law
or that the same were made to hinder, delay, and defraud the
complainant.

The complainant replied generally to the defendants' answers,
and numerous depositions were taken for the complainant and
the defendants, and the court below dismissed the bill, upon the
ground that the evidence was not sufficient to sustain the charge
that the deeds were not upon a consideration deemed valuable
in law, leaving out of view the evidence adduced to show that
the defendant, John T. Mayo, had knowledge of the fraudulent
intent of the grantor, B. Mayo, in making the deeds in question.

The first question for consideration is, do the pleadings put
in issue, as to the defendant John T. Mayo, the fact whether

or not the conveyances in question were made with the intent on the part of the grantor, B. Mayo, to hinder, delay, and defraud the appellant, and that the defendant, John T. Mayo, was privy to such fraud?

The averment of the bill as to fraud in the execution of the deeds follows the forms given by Barton in his Chancery Practice, and Sands in his Suit in Equity, where deeds are attacked on the ground that they were made without consideration deemed valuable in law, and with the intent to hinder, delay, or defraud the creditors of the grantor.

The averment is almost identical with that in the case of *Herring et als.* v. *Wickham*, decided by this court, and reported in 29 Gratt. 628. In that case there was no demurrer to the bill, but an answer only by Mrs. Wickham, denying the allegations of fraud, and disclaiming any knowledge on her part of the fraudulent intent of the grantor, yet the court in its opinion by Staples, J., after holding that the deed was upon a valuable consideration, marriage then being in law deemed a valuable consideration, said: "If it be conceded, therefore, that Mr. Wickham's intention in making the settlement was to avoid payment of his debts, the question still arises, Did Maria F. Kersey (now Mrs. Wickham) have notice of that intention?" and he proceeded to discuss that question at great length, holding that the evidence was not sufficient to fix upon Mrs. Wickham knowledge of the fraudulent intent of the grantor in making the deed of settlement under consideration. It, therefore, clearly appears that the court in that case considered that that question was put in issue, otherwise, after holding that the deed was upon a consideration deemed valuable in law, the end of the case was there reached, and the court would not have gone into a careful consideration of the evidence as to whether Mrs. Wickham was a privy to the fraud alleged in the bill.

Fraud must be charged, and this should, in general, be done by setting forth the facts which constitute the fraud. A mere

allegation imputing motives of fraud is not sufficient. But an averment of an intent to delay, hinder, or defraud creditors is not an averment of a conclusion of law, but of an essential fact. Fraud may be sufficiently averred by setting forth the particular manner in which the act was done, and the particular end and design to be accomplished. Where the facts thus stated show that a fraud was designed and perpetrated, that may be a sufficient averment of the fraud, although the bill does not state the conclusion which the law will draw that the act was fraudulent. Bump on Fraud. Con., p. 547.

The averment of the bill in this case is that the grantor, B. Mayo, conveyed by the two deeds in question, all of his property to his son, leaving nothing out of which complainant could make its debt, and that the deeds were not only without consideration deemed valuable in law, *but* were executed with intent to hinder, delay, and defraud the complainant.

Now, the averment that there was no consideration must necessarily relate to the grantee as well as to the grantor, as the consideration could alone come from him, and when that averment is followed immediately by the conjunction " but," it seems that it would have no real sense, unless this word referred also to the same persons as the word " consideration " refers to.

A deed is the method by which the title of real estate is transferred from one person to another, and there must be a grantor and a grantee, and where the charge is that the deed was executed with intent to defraud; that it is as a part of a scheme to defraud, it seems to necessarily follow that the charge of fraud and the manner in which it was perpetrated refers to the grantee as well as to the grantor, and in this case the grantee, John T. Mayo, so understood the averments of the bill, as he not only did not demur to the bill, but specifically denied that he had knowledge of the fraudulent intent of his father in conveying his property to him, nor did he object to any question asked of the witnesses, which went to prove that he did participate in the fraud alleged.

A bill of this character must at least tender an issue which can be met by a denial, and by testimony, and direct the court to an inquiry that is definite and intelligible, but general certainty is all that the courts of equity require in the statements of facts in a bill. Facts may often be indirectly alleged, or expressed by necessary implication; and a charge in general terms, where it is the point on which the merits of the cause turn, and does not come in collaterally and incidentally, will warrant the production of evidence to particular facts. 6 Eng. Pl. & Pr., pp. 284-5, and authorities cited.

We are of opinion that the pleadings in this case are sufficient to put in issue whether or not the conveyances attacked as fraudulent were made with intent to defraud, and that the grantee, John T. Mayo, was privy to such fraud, and this brings us to the consideration of the evidence relied on to show not only a want of consideration deemed valuable in law sustaining the deeds, but that they were executed with fraudulent intent on the part of both the grantor, B. Mayo, and the grantee, John T. Mayo, his son.

Where a conveyance is attacked on the ground of fraud the burden is primarily on him who charges it, but this burden is shifted to those who try to uphold the conveyance when a *prima facie* case of fraud is shown. *Hickman* v. *Trout*, 83 Va. 490; and *Todd* v. *Sykes, ante,* p. 143, and the authorities there cited.

It may be said, without a review of the evidence in the case before us, that the presence of *indicia* of fraud clearly appears, and the burden of proof rests upon the appellees to show the *bona fides* of the transaction herein assailed by the appellant.

The vendee having the burden thus cast upon him must show that he paid a valuable consideration for the transfer of the property in controversy, and if this is established by the evidence, proof of the vendor's fraudulent intent is insufficient, but, though the vendee paid a valuable consideration for the property, still, if he had a fraudulent intent in taking the conveyances, or had

notice of the vendor's evil design, the conveyances are fraudulent and void as to the claim of appellant asserted in this suit. Waite. on Fraud. Con., sec. 271.

The grantor, B. Mayo, had been engaged in the fishing business as partner with one F. P. Whitehurst, who died in 1895, and was also engaged in merchandise in the city of Norfolk, conducting a retail grocery store in charge of his son, John T. Mayo, who, with his wife and one child, lived over the store, and this latter business continued until September, 1896, when the store and its contents were burned at 2 o'clock in the night.

The claim of appellant asserted in this cause was contracted by the firm of Whitehurst & Mayo, but chiefly on the credit of B. Mayo, as Whitehurst owned no property. B. Mayo at that time was possessed of real estate worth from $8,000 to $10,000, but was insolvent. He was so largely in debt, to use his own language, he "owed everybody and was afraid to meet anybody." It was his avowed purpose not to pay any of the debts contracted by the firm of Whitehurst & Mayo, among which was the debt of the appellant, and it is not seriously denied by John T. Mayo, appellee, that he had notice of his father's insolvency, for his father not only told him this, but told him that he would have trouble if he bought his property. He also knew of the pendency of the common law suit of appellant against his father for the debt due to appellant when he took the conveyances from his father of all the father's property. The father at that time, it is true, had one or two other pieces of real estate standing in his name, but it is confessed in this record that he held the legal title to this property for one Shellhouse in order to keep it out of the reach of Shellhouse's creditors, and about the same time that he conveys his own property to his son this Shellhouse property is conveyed by him to Shellhouse's mother, and this same Shellhouse and John T. Mayo, after these conveyances were made, turn up as the owners of B. Mayo's fishing outfit in time to keep it out of the reach of appellant's execution against B. Mayo.

The appellee, John T. Mayo, claims to have paid his father as the consideration for the conveyances to him of all his property $4,500 in cash, and assumed mortgages on the property amounting to something like $1,500. Both the father and son were examined in this case as adverse witnesses, and separately. When questioned by appellant's counsel as to how he acquired the means with which to purchase and pay for his father's property, John T. Mayo makes the statement that he had $2,400 of the money which he had saved up from his salary when working for the Atlantic Tea Company at $15 per week from the time he was about 17 years of age till he was about 20, and from the same salary or pay received by him from his father from the time he took charge of his father's store to the time the store was burned, which was not quite three years. He says that while living with the Atlantic Tea Company he did not throw away more than $2 per week, as he had no board to pay, and only to buy his clothing, to pay his car fare and ferriage over to Portsmouth, where his business was, and to pay for his cigars; that his smoking was his chief item of expense, as he smoked all the time, but his cigars and cigarettes did not cost him over $1.50 per month. He says that while working for his father he took out his $15 per week every Saturday night, and turned over the balance of the money taken in at the store during the preceding week to his father; that the only expense he had while living and keeping house over the store was that of clothing himself, wife and child, and other necessary expense, except groceries, which he got from the store. Now, then, his statement, in substance, is that in little less than six years, upon a salary of $15 per week, (though as we shall presently see, his father's sworn statement is that he only paid his son $10 per week he saved and had in cash $2,400, and, moreover, he says that he had $700 more and " much more." He made no investments during this time, nor did he deposit a dollar in any bank, and, when asked where he kept this money, he answered that he kept it with him

up over the store where he stayed.   When asked " Did you keep
it in a safe, or just up stairs? " he answers, " I had a safe down
stairs, and I was very much afraid of that safe, and I kept that
money where I could get it."   " Did you ever show it to any-
body? "   Answer: " No, sir.  If I had been living in that neigh-
borhood, and would let anybody know that I had that much
money, why I would have been crazy.   That is worse than the
Five Points in New York."   When asked how much money he
saved the last year, he answered he could not tell, nor could he
tell how much money he had when he went to work for his
father in the store.   He says that when the store was burned
(at night, as we have seen,) he came out of that house with
nothing but a pair of shoes, an undershirt, " and that little
bundle of money "; that all of his, his wife's, and child's clothing
was burned.   According to his statement, notwithstanding his
father owed him, and still owes him, $300 of borrowed money,
he paid, in the law office of Mr. Drewry, in the city of Norfolk,
in the presence of Mr. Drewry, $3,900 in cash to his father, all in
paper money, and paid him a short time thereafter $600, making
the $4,500, the money consideration for the conveyances of his
father's property to him, of which amount he says he paid of his
own money $2,400, and $1,500 borrowed of a man by the name
of Wharton, secured by trust deed on the property he got from
his father; yet, within one month before the supposed purchase
from his father, John T. Mayo tried to borrow $300 from Colonel
Ackiss, a witness in this case, to replenish goods in the store that
was afterwards destroyed by fire, and, but a short time after the
conveyance from his father, sold a piece of the property con-
veyed to him for which he paid, as he claims, $900, for $700;
although, if he is to be believed, he had not only the $2,400
which was paid over to his father in Drewry's office, but $700
more and " much more " money, none of which he attempts to
account for except the $2,400.   Not a living soul testifies to his
having money, none saw the bundle of " $2,400 " and " $700

and much more," all paper money that he brought out of the store when it was burned, but witnesses, who had known him all of his life well, say that they never had any reason to suppose he had money saved up and never heard of it, and never before had he invested money in real estate, nor, as we have already seen, put a dollar in bank or elsewhere at interest.

B. Mayo was unable to say where his son got the money with which to pay for the property conveyed to him, and repeats the statement that the salary of his son when working in the store was only $10, instead of $15, per week, and that this was not paid, but was retained by him as due to his son, and that the accumulated amount, which he was unable to give, even approximately, amounted to somewhere between $1,000 and $1,500, and this amount due to his son, whatever it was, went to make up in part the money consideration that his son paid him for the property. He was unable to say just how much his son paid him in Mr. Drewry's office, but, according to his statement, it was not over $3,000. B. Mayo says that he took the money paid him by his son in Drewry's office home, and gave it to his wife to take care of, yet neither Mrs. Mayo nor Mr. Drewry was examined in this case to prove that they ever saw the money. His statements as to what he did with the money are so evasive, rambling, and contradictory of each other as to scarcely merit consideration. We will, however, consider the statement as to what he did with $2,900 of the money, as this is relied upon so much as showing the *bona fides* of the transaction by which John T. Mayo acquired his father's property.

He says he paid $1,900 of the money to W. L. Whitehurst as a repayment of that amount borrowed from him, but he could not tell whether he paid it to Whitehurst before Christmas, 1896, or after. One time he said it was before; again he said it was after. Nor could he produce the note paid to Whitehurst, although he said he had it, and was given an opportunity to produce it.

Whitehurst was examined for the defence, and, according to his statement, he loaned B. Mayo several sums of money, but could not tell when, and, in giving the amounts loaned him at different times, he shows that they sum up $1,750, and not $1,900, leaving out of all consideration interest on the amount, and he admits that he took no notes from B. Mayo for the amounts loaned him until about the time Mayo conveyed his property to his son. Whitehurst says that B. Mayo paid him this money in the street in Norfolk; that he was riding along in his road-cart, when B. Mayo hailed him, and said he wanted to pay him what he owed him; that B. Mayo went off, and after a little while came back, and handed him a bag of money, gold, silver and paper money, which he (Whitehurst) took out to his home, five or six miles in the country, without counting it, and did not count it until the next day, or possibly several days, but delivered Mayo his note the next time he saw him. When asked what he did with this money, he stated that he paid some debts with some of it, and drank up the balance, and refused to show that he had put any of the money in bank, or what he did with it, and says he took no security from B. Mayo for the money loaned him, although the proof is that he was very particular to see to the security for money loaned to others in less amounts, and afterwards refused to take up a note of B. Mayo's, secured by trust deed, until his lawyer assured him it was all right. In fact, the answers to the questions propounded to him are so evasive and frivolous as to make it very questionable whether or not he is entitled to belief; but, in the view we take of this case, it is immaterial whether his statements are true or not.

Of the money paid to B. Mayo by his son, as is claimed, B. Mayo says that he paid $1,000 of it to a man by the name of Collins for money borrowed of him, but Mayo could not tell when he borrowed the money, nor could he produce the note said to have been paid Collins. True, Collins testifies that he paid him the money, but Collins could not tell when the note

was payable, and nothing definite beyond that he loaned Mayo the money, and Mayo paid it some time in September or October, 1896. He admits that the only property he has stands in his wife's name; that he has been a borrower of money secured on that property, and borrowed money for his wife to pay for other property about the time he says he loaned B. Mayo the $1,000. His testimony, like that of Whitehurst, is frivolous and evasive, and in fact all that need be said of it is that it does not bear the impress of truth.

But if it be conceded that B. Mayo did pay W. L. Whitehurst $1,900, and Collins $1,000, some time within several months after the conveyance of his property to his son, still this is not important in this case, and has, at most, but little bearing upon the question whether or not John T. Mayo paid for the property conveyed to him by his father, for it appears that the $1,500 borrowed from Wharton was secured on the very property that was conveyed to John T. Mayo, and that B. Mayo, if he is to be believed, got the insurance on his storehouse and its contents amounting to something like $850, and had money from other sources about that time; so that he could have paid the debt to Whitehurst, and the debt to Collins, without having gotten it from his son, and these debts were due to friends whom he says he all the time intended to pay. Father and son were at that time living together, in the same house. No change is made either in the residence or business of the father, only the title to the property is transferred to the son, and the business continued in his name.

It moreover appears that but a very short time after these conveyances were made, both B. Mayo and his son proposed to Colonel Ackiss to secure a debt which B. Mayo owed him on a part of the property which John T. Mayo claimed to have purchased from his father, and in a conversation in this connection had between Colonel Ackiss and B. Mayo, in the presence of John T. Mayo, B. Mayo, referring to the conveyance to his son,

said to Ackiss that the transfer would have been made to him, but he knew that he (Ackiss) would not have taken it. To this, with John T. Mayo still present, Colonel Ackiss replied: " No, sir; all you could convey to me would be enough to pay my debt. I have had a good many offers in my life to cover up property "; and John T. Mayo said not a word in reply to this insinuation that the deeds from his father to him were for the purpose of covering up the property, although before this, without provocation, or even fraud suggested, as to the conveyances in question, John T. Mayo said to this same witness, Ackiss, that he had purchased his father's property, paid for it, and if anybody said there was any fraud in it he intended to sue them.

Much stress is laid upon the fact that Colonel Ackiss says that he had known B. Mayo a long while and always regarded him an honorable man; that is, up to the time of the making of these deeds to his son. It may be true that Mayo up to that time had been honorable and upright in his business transactions, and still yielded to the temptation to save his property, by a fraudulent transfer of it to a member of his own family, when overtaken by insolvency and tested by adversity, an experience he had never had before and one that too often, it is to be deplored, carries off their feet men of a higher order of intelligence, and who have better opportunities than he to acquire better ideas of morality, causing them to resort to methods they never before thought of, and would have scorned.

This witness had another very good reason for changing his opinion of B. Mayo, whom he had often trusted and befriended. After the transfer of his property to his son, and the conversation between the witness and B. Mayo, in the presence of John T. Mayo, before spoken of, B. Mayo met witness, a man 74 years of age, called him a thief, and struck him a violent blow in the face, because, as he said, witness had told things that had been told him in confidence, referring, of course, to the conversation in the presence of John T. Mayo.

The statements of B. Mayo and John T. Mayo are irreconcilably in conflict as to all material facts going to establish the honesty of this transaction. Many of the conflicting statements have already been set forth, a number of others might be mentioned, among which is the statement by B. Mayo that his son paid him the $3,000 in Drewry's office in gold, silver, paper, and perhaps some in copper, while the emphatic statement of John T. Mayo is that the whole $3,900 he claims to have paid was in paper. B. Mayo said his business did not pay him, and that was why he sold out. John T. Mayo says not only that it paid, but paid well.

The circumstances attending and following a transaction are often of such character as to leave not even a shadow of a doubt as to the real object and motive of the parties engaged in it. *Hazlewood* v. *Forrer*, 94 Va. 706.

In order to avoid the conveyance, it is not necessary to prove that the grantee had positive knowledge of the grantor's fraudulent intent. It is sufficient to prove that the grantee had knowledge of facts and circumstances which were naturally and justly calculated to excite suspicion in the mind of persons of ordinary care and prudence, and which would naturally prompt him to pause and inquire before consummating the transaction, and that such inquiry would have necessarily led to a discovery of the facts from which the law imputes fraud to the grantor. *Ferguson* v. *Daughtrey*, 94 Va. 308.

The evidence in the case at bar has been given a most careful consideration, and we are of opinion that the transfer of the property of B. Mayo to his son, complained of, was without consideration deemed valuable in law; that the deeds in question were executed with intent to defraud the appellant, and that John T. Mayo had notice of the fraudulent intent of the grantor and was a privy to the fraud.

Therefore, the decree appealed from is erroneous and should be reversed, and this court will enter such decree as the court

below should have made, setting aside the deeds of conveyance in question as fraudulent and void as to the judgment of appellant asserted herein, and remanding the cause to the court below for such further proceedings as may be necessary to carry into effect the decree of this court.

HARRISON, J., dissenting:

This suit was instituted by creditors of B. Mayo to vacate and set aside certain deeds made by him to his son, John T. Mayo, upon the ground that they were not upon a consideration deemed valuable in law, and were executed with intent to hinder, delay, and defraud said creditors.

The principles of law governing this class of cases are so well settled, and have been so frequently stated in recent decisions of this court, that it is wholly unnecessary to repeat them here.

Without expressing any opinion upon the question of pleading raised, but conceding that notice by the grantee of the fraudulent intent charged, is sufficiently alleged, there are but two questions, both of fact, presented by the record, and they, in a measure, dependent upon each other. First, was a valuable consideration paid for the property conveyed; and, second, is the allegation of a fraudulent purpose in executing the deeds sustained?

The evidence shows that four pieces of property were conveyed at the aggregate price of $6,000. That this sum was, if paid, the full value of the property is not denied.

It further appears that of this purchase price $1,500 was in the shape of two mortgages on the property, which were assumed by the purchaser, thus leaving $4,500 to be accounted for. Of this balance, John T. Mayo swears that he paid in cash $3,900, and the residue of $600 from time to time since the transaction. Of the $3,900 claimed to have been paid in cash, $1,500 thereof was borrowed from E. Wharton, who testifies that he made the

loan to aid John T. Mayo in making the purchase, and took a
deed of trust on part of the property to secure the same.    E.
Wharton is shown to be a truthful and reliable man.    John T.
Mayo testifies that the residue of the $3,900 cash payment,
viz.: $2,400, was the accumulation of six years of hard work
and self-denial, at $15 per week, during which time his expenses
were extremely small, and he very careful and saving of his
earnings.    Fifteen dollars per week would be $780 *per annum,*
and an aggregate of $4,680 in six years.    It is not improbable
that a sober, steady young man, as John T. Mayo is shown to
have been, bent upon saving his money, as he appears to have
been, should have accumulated $2,400 out of $4,680 in six years.
He, like most of the principal witnesses in the case, appears to
be ignorant, unlettered, and unaccustomed to the ordinary and
usual methods of business; but his evidence, though subjected
to a long, searching, and tedious cross-examination, impresses
me as the testimony of one who desired to tell the truth as far as
he knew it.    There is no contradiction of his testimony on the
important point of the amount of his savings during those six
years, except the statement of his father that during the three
years he worked for him he got $10 per week. I think the weight
of evidence on this point is in favor of the correctness of the
son's statement, but, conceding that he only got $10 per week
during three years of the time, that would make his aggregate
earnings in six years $3,900, during which time he had no board
to pay, not even for his wife, whom he married about two years
before the transaction in question, her board and his being addi-
tional consideration for his services.

   B. Mayo is shown to have been, for some time, very much
pressed financially, often creating one debt to pay another, until
he could no longer carry the burden, when he sold his property
to his son upon the terms already stated, so that he might, as his
testimony shows, pay those debts having, as he thought, the
highest claim upon him.    He says that he disbursed the cash

received from his son, in paying W. L. Whitehurst a debt of $1,900, and J. C. Collins a debt of $1,000, and the residue in small bills which he could not remember. That about the time he received the purchase money from his son he paid these two debts, is proved by Whitehurst and Collins, who are shown to be substantial and reliable men, and there is no satisfactory or reliable evidence that B. Mayo had any other resource, than the sale of this property, from which he could have paid these debts; and it is to be presumed that so important a fact would have been established had it been possible.

In the face of the uncontradicted testimony of all these witnesses to the fact, it is thought improbable that these transactions should have taken place by the transfer from one of these persons to another of cash in payment for the property, and in payment of the debts of B. Mayo, which were satisfied, and no bank account or memoranda to evidence one of them. Among experienced and enlightened business men this is not the usual method of doing business, but the parties engaged in these transactions were far removed from that enlightened class. They were hucksters and fishermen, honest in their dealings with each other, but their lot in life affording them no opportunity for learning and practicing improved business methods. Mr. W. W. Old, a well-known gentleman of the highest character, testifies that the witness, W. L. Whitehurst, to whom B. Mayo paid the debt of $1,900, was a prosperous and successful farmer; that he had known him for years, and had many transactions with him, and that about the time of the transactions under investigation he had paid him in cash as much as $2,000 in gold. W. L. Whitehurst testifies that B. Mayo paid him the $1,900 debt in cash, the larger part thereof in gold. J. C. Collins, to whom B. Mayo paid the debt of $1,000, from the proceeds of the sale to his son, when pressed on the witness stand as to the probability of his carrying much money on his person, stated that he then had $1,000 in cash on his person, and that he often

had more than that in his pocket at one time. This witness says that B. Mayo paid him the $1,000 debt in cash. Transferring considerable sums of money in cash appears to have been usual with all the parties to these transactions, and in the face of such evidence as to their business habits, it cannot be regarded as unreasonable, and affording ground for doubting that John T. Mayo had the money he claims in cash, turned it over to his father in cash, who in turn paid it out to his creditors in cash. The grantor, B. Mayo, is shown to have been a man of high character. The witness, C. B. Ackiss, a disappointed creditor, who exhibits much feeling at not having been paid in full, in speaking of his relations to B. Mayo, the grantor, says they were " as friendly as any man on earth, and no man had my confidence more financially than he had up to that conveyance, and I said repeatedly, give me assurance of his life, and I would as lief have his word as his bond, because he owed me so much and paid me like a man, that I could not do otherwise."

Importance is attached to the statement of this witness, as showing a guilty conscience on the part of John T. Mayo, that he met the latter in the market and " called to him to know why this transfer had been made," and that Mayo replied, " Well, I bought it, and paid for it, and anybody who charges me with getting it fraudulently I am going to sue them." The construction sought to be put upon this remark is not justified by the facts. It appears that the father had said to his son, when he was proposing to buy, " If you do you will have trouble about it." The subject of trouble ahead having been discussed, it was not unnatural that the son when accosted in the manner stated, should have made the reply he did. In view of the father's warning he was looking for trouble, and the question indicated to his mind that it was at hand.

Importance is further attached to the statement of this witness that B. Mayo, in a conversation between them, said to him, " I would have come to you to have made this conveyance, but

I knew you would not accept it." This was intended, by the witness, to convey the idea that B. Mayo would have been willing to cover up his property through him as the grantee, instead of through his son, but for the difficulty of getting witness to engage in the business. When looking for evil, we often see it in the purest and most innocent words, as well as acts. The language attributed to B. Mayo is susceptible of a perfectly innocent construction. Would not the remark have been perfectly natural as indicating the *bona fides* of the sale to his son? The language naturally means, " I would have come to you to make the conveyance, but I knew you would not accept it at the price my son paid." This is a reasonable construction of the language used, while the interpretation sought to be placed upon it is strained and unnatural.

Great stress is laid upon numerous discrepancies between the evidence of B. Mayo and his son, John T. Mayo, touching the matters upon which they were examined, as showing their testimony to be unreliable. It is true, there are a number of discrepancies in the evidence of these two witnesses, most of them, however, wholly immaterial, and others can be accounted for by the fact shown that B. Mayo had become seriously addicted to drink. The character of his testimony, as well as other evidence, shows that B. Mayo was an unlettered and extremely ignorant man; that he kept no books or memoranda of any kind, had no memory for dates, amounts or other details, and yet his examination covers about forty printed pages of the record, of searching investigation into details of dates, figures, and a variety of transactions running through years of business, most of it wholly immaterial, that would have puzzled and confused a skilled and experienced witness. It is not strange that this ignorant old man, forced often to guess at matters, he protested his ignorance of, should under such circumstances have contradicted others and himself as well. Upon the real issue, however, he was clear and distinct that this sale to his son was *bona fide*, for a full and

valuable consideration, with no thought of defrauding his creditors, but for the purpose of paying such of them as he thought had the highest claim upon him, and that the purchase money was actually disbursed in paying his debts.

The evidence of John T. Mayo is clear, reasonable, and uncontradicted that he had the means, and did pay his father the entire purchase money in the manner already shown. The evidence of the two witnesses, Whitehurst and Collins, shows that when the sale was made $2,900 in cash was paid to them in discharge of *bona fide* debts, while B. Mayo testifies that the residue of the cash received by him from the sale was disbursed in paying other *bona fide* obligations; and the good character and honesty of all involved in these transactions are shown, not infrequently by the evidence of the appellant.

In the light of such testimony, mere " badges of fraud " count for nothing, for the uncontradicted evidence of fair dealing outweighs the so-called suspicious circumstances (*Gordon* v. *Cannon*, 18 Gratt. 387) unless, indeed, all the witnesses whose evidence tends to establish the integrity of the transaction, have conspired, and united in a pure fabrication. In this view I cannot concur. The record discloses no motive for such a combination, nor is any reason suggested for such an alliance from any quarter. If a stranger stood in the shoes of the son, and the case was in all other respects as presented by the record, there can be but little doubt that the transaction would pass without challenge. I think the son is entitled to the same immunity unless the alleged wrong doing is made clearly to appear.

I am therefore of opinion that the conclusion reached by the lower court is without error and should be affirmed.

BUCHANAN, J., concurs with HARRISON, J.

*Reversed.*